**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 1:22-cv-01567-DDD-SKC

**KARI KIRKPATRICK,**

> Plaintiff,

v.

**CENTURA HEALTH-LONGMONT UNITED HOSPITAL,
d/b/a LONGMONT UNITED HOSPITAL,**

> Defendant.

---

## MOTION FOR SUMMARY JUDGMENT

---

Defendant, Catholic Health Initiatives Colorado d/b/a Centura Health-Longmont United Hospital ("Defendant" or "LUH"), by and through its attorneys, Hall, Render, Killian, Heath & Lyman, P.C., submits its Motion for Summary Judgment ("MSJ") under Rule 56, F.R.C.P., in the above captioned matter as follows:

## <u>INTRODUCTION</u>

Ms. Kari Kirkpatrick ("Kirkpatrick") alleges in her Complaint that she was retaliated against by LUH when she was terminated for "engaging in protected activity[.]" Complaint at 1. As discussed more fully below, **it would not have been possible** for Kirkpatrick to have been terminated for engaging in protected activity because she never did so – **as she has already admitted, under oath**. Consequently, this Court can and should dismiss her retaliation claim with prejudice, without even needing to consider LUH's reasons for her termination.

Even if Kirkpatrick could established a *prima facie* case of retaliation, she cannot show that LUH's reasons for terminating her were pretextual. LUH honestly believed the reasons it gave for Kirkpatrick's termination, including that Kirkpatrick was careless and blundering with sensitive communications and continually failed to timely report issues that could impact LUH legally. This Court should grant LUH's MSJ and put an end to this meritless suit.

This MSJ is based primarily on Kirkpatrick's admissions made under oath during her unemployment benefits appeal hearing on June 3, 2020 ("6/3/2020 Hearing") and June 26, 2020 ("6/26/2020 Hearing"). It is also supported by the sworn declarations of various LUH personnel who have knowledge of the events surrounding Kirkpatrick's employment and termination.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### As A Manager, Kirkpatrick Was Trained And Required To Immediately Report All Issues Related To Discrimination and Harassment.

1. Kirkpatrick was hired as Manager of Imaging at LUH in February of 2019 and started the position on March 11, 2019. Ex. A, 6/3/2020 Hr'g 35:6-22.

2. As a manager, Kirkpatrick was required to undergo Harassment Prevention Training (the "Training"), which she completed on May 16, 2019. Ex. A 50:5-8; Ex. B, Reed Decl. ¶3.

3. The Training addressed the need to immediately "notify HR… or your direct supervisor" "any time you heard of any kind of harassment" or discrimination. Ex. A 49:23-50:9; *see also* Ex. B ¶ 3.

4. Kirkpatrick admitted at the 6/3/2020 Hearing that, as a leader, she knew she was required to report prospective harassment and/or discrimination claims to her supervisor or the employer since it "f[e]ll under [her] job duties." Ex. A 49:5-14.

**Kirkpatrick Failed to Timely Report A Legal Complaint, Exposing LUH To Potential Liability.**

5.    Mark Mott ("Mott"), a Transport Aide at LUH, states in his declaration that, after returning to work after the first weekend in December of 2019, which would be December 9, 2019, he advised Kirkpatrick that Lauren Carson ("Carson"), also a Transport Aide and one of Kirkpatrick's direct reports, had plans to take legal action against LUH.  Ex. C, Mott Decl. ¶ 1; Ex. B ¶ 4.

6.    Despite being required to immediately report this, Kirkpatrick did not make a timely report to her Director, Keri Isernhagen ("Isernhagen"), or to Human Resources ("HR"). Ex. D, Isernhagen Decl. ¶ 7; Ex. B ¶ 5.

7.    Carson's planned legal action was to be based on perceived discrimination in wages between male and female employees. Ex. C ¶ 1.

8.    LUH's HR Director, Marie Reed ("Reed"), understood that when an employer receives any allegation of discrimination, it has a legal responsibility to investigate and take prompt remedial action, if warranted. Ex. B ¶ 3.

9.    According to Reed, the investigation would have involved an interview of Carson about her discrimination concerns. Ex. B ¶ 5.

10.    No such investigation was undertaken, however, because Kirkpatrick did not report the threatened litigation to HR immediately after December 9, and Carson resigned with her last day of work on December 24, 2019. Ex. B ¶ 5.

11.    According to Reed, if HR had been involved in discussions with Carson prior to her resignation, the resignation might have been avoided or her legal claims might have been

resolved through a separation agreement. Ex. B ¶ 5. However, due to Kirkpatrick's failure to timely report, LUH never had the opportunity to explore those options. Ex. B ¶ 5.

12.     On December 30, 2019, Kirkpatrick told Isernhagen and Reed about the claim Mott told her about on December 9. Ex. A 45:10-12; Ex. B ¶ 4; Ex. D ¶ 7. Kirkpatrick reported she had learned about it two days earlier, on December 28th. Ex. B ¶ 4; Ex. D ¶7.

13.     Specifically, Kirkpatrick reported that Carson, who had recently resigned from LUH, told her she had plans to file a claim of discrimination against LUH. Ex. B ¶ 4; Ex. D ¶ 7.

14.     On January 28, 2020, LUH received notification that Carson had filed a charge of discrimination against LUH. Ex. B ¶ 5. Isernhagen informed Reed that, in discussions between Isernhagen and Kirkpatrick about the potential litigation, Kirkpatrick revealed that Mott had told her about this potential claim on December 9, 2019.  Ex. D ¶ 7. Reed asserts in her declaration that during an HR interview with Kirkpatrick on February 4, 2020 about Carson's charge, Kirkpatrick repeated to her that she had learned about Ms. Carson's claim during her December 9th conversation with Mott. Ex. B ¶ 5.

15.     Kirkpatrick's failure to timely report this prospective claim, which prevented LUH from dealing more effectively with a potential liability, was one of the reasons that led to her termination. Ex. B ¶ 5.

**Kirkpatrick Failed to Timely Report And Address The Potential Need For An Accommodation For A Pregnant Employee At LUH.**

16.     On February 13, 2020, Reed met with Kirkpatrick to ask her about her prior interactions with an LUH employee, Veronica Smith ("Smith"), who had recently filed an EEOC charge against LUH while still an employee. Ex. A 51:5-10; Ex. B ¶ 6. Among other things, Reed

asked Kirkpatrick about whether Smith had ever requested an accommodation related to her work. Ex. A 54:15-18; Ex. B ¶ 6.

17.    Reed affirms Kirkpatrick told her that she was aware of a physical limitation related to Smith's pregnancy that she said had been previously reported to her by Smith's coworker, Morgen Frank ("Frank"). Ex. B ¶6.

18.    Frank testifies that she made this report to Kirkpatrick **months** earlier – in the timeframe of October or November of 2019. Ex. E, Frank Decl. ¶ 4.

19.    According to Kirkpatrick, Frank expressed to Kirkpatrick her "concerns about [Smith] asking other aides to help her" and inquired about potential accommodations. Ex. F, 6/26/20 Hr'g 116:18-21; 122:17-20; Ex. B ¶ 6.

20.    During the February 13 conversation, Reed reminded Kirkpatrick that as soon as LUH leaders become aware that an associate may need an accommodation, the leaders need to address it as soon as possible. Ex. B ¶ 6. Reed also expressed that discrimination and accommodations are both serious legal issues that need to be addressed and/or escalated immediately. Ex. B ¶ 6. Kirkpatrick acknowledged this. Ex. B ¶ 6.

21.    At the end of the conversation between Reed and Kirkpatrick, Reed asked Kirkpatrick to engage the employee to inquire about possible accommodations. Ex. B ¶ 6. Kirkpatrick never followed through on this request. Ex. B ¶ 6. As a result, Reed had to ask Isernhagen to have this conversation. Ex. B ¶ 6; Ex. D ¶ 8.

22.    Kirkpatrick's failure to timely address and report the potential need for an accommodation was another reason for her termination. Ex. B ¶ 6.

**Kirkpatrick Engaged In Misconduct Related To An Upcoming Reduction In Force.**

23.    In her role as Manager of Imaging, Kirkpatrick was expected to recommend individuals filling a certain amount of Full Time Equivalents ("FTEs") for an upcoming, planned reduction in force ("RIF") at LUH that was to take place on February 28, 2020. Ex. F 106:2-8; Ex. B ¶ 7; Ex. D ¶ 9.

24.    Kirkpatrick was required to report her recommendation to Isernhagen and to HR. Ex. B ¶ 7; Ex. D ¶ 9.

25.    At RIF planning meetings attended by Kirkpatrick, Isernhagen, Reed, and other leaders, all attendees were told they were not allowed to disclose any specific announcements about the RIF, including the personnel being considered for the RIF, before the final approval process by the Executive Team (i.e., the C-Suite) had been completed. Ex. B ¶ 7; Ex. D ¶ 9. Kirkpatrick admitted under oath that the list of employees subject to the RIF "had to go through an approval process that included approval by upper management and the legal team." Ex. F 106:9-12.

**Kirkpatrick Prematurely Promised An Employee He Could Retire Early, Despite Not Receiving Approval From Human Resources And Despite The Fact That LUH Does Not Offer Early Retirement.**

26.    In early February of 2020, Kirkpatrick told Isernhagen that there was potential for a voluntary RIF/early retirement in Radiology that could satisfy part of the RIF. Ex. A 40:4-9; Ex. D ¶ 10.

27.    Isernhagen told Kirkpatrick multiple times that she needed to bring the potential for the voluntary RIF/early retirement to HR's attention to see if it would be an option, but Kirkpatrick continuously failed to do so. Ex. A 40:18-20; Ex. D ¶ 10.

28.     On February 6, 2020, Isernhagen asked Reed if Kirkpatrick had talked with her about the potential voluntary RIF in Radiology. Ex. B¶ 8. As of that time, Kirkpatrick had not done so. Ex. B ¶ 8.

29.     Then, on February 7, 2020, Kirkpatrick scheduled a meeting with Isernhagen, Reed, and the employee who wanted to retire early to discuss the details of the employee's early retirement. Ex. B ¶ 9; Ex. D ¶ 10. Kirkpatrick titled the meeting invitation "Early Retirement" and scheduled the meeting for February 11th. Ex. B ¶ 9.

30.     After receiving the meeting invitation, Reed requested that the name of the meeting be changed because LUH does not offer early retirement. Ex. B ¶ 9.

31.     With the exception of sending the meeting invitation, Kirkpatrick did not speak to Reed at all prior to the meeting about what the specifics were of the voluntary RIF. Ex. B ¶ 9. Had Kirkpatrick contacted HR beforehand, she would have learned that LUH does not offer early retirement. Ex. B ¶ 9; Ex. D ¶ 10. Nevertheless, it was already quite apparent to Reed that Kirkpatrick had already created an expectation with the employee that he could retire early. Ex. B ¶ 9.

32.     During the February 11th meeting, Kirkpatrick told the voluntary RIF candidate that his last day would be February 20th and that he was at the meeting for Reed to go over his RIF packet with him. Ex. B ¶ 10. She said this despite the RIF being scheduled to take place on February 28, 2020 and despite there not being approval for him to be part of the RIF. Ex. B ¶ 10.

33.     To temper expectations, Reed told the employee that they did not know at that point whether he could be part of the RIF or whether his last day could be February 20th, but Kirkpatrick had already created a very strong expectation that these things would happen. Ex. B ¶ 10.

34.     Kirkpatrick admitted in her 6/3/2020 Hearing that on February 12th, she told the employee "it would be done on that date [February 20th]." Ex. A 66:5-11.

35.     Unfortunately, HR was unable to process the voluntary RIF as promised by Kirkpatrick by February 20th, which made the voluntary RIF candidate very upset. Ex. B ¶ 10.

36.     Kirkpatrick's decision to essentially promise an employee something that was not an option at LUH and something that she did not approve with HR put LUH in an untenable position. Ex. D ¶ 10. It was another reason for her termination. Ex. B ¶ 10.

**Kirkpatrick Disclosed Premature and Unapproved Communications, Causing Undue Angst Amongst Staff at LUH.**

37.     On February 12th, Isernhagen learned from one of her direct reports that, during a daily huddle, Kirkpatrick disclosed that one person would be voluntarily part of the upcoming RIF and one person from Radiology Support would be subject to the RIF. Ex. D ¶ 12.

38.     After the daily huddle, Xander Howard ("Howard"), a PACS administrator at LUH, went with Kirkpatrick back to her office and asked her specific questions about the RIF. Ex. G, Howard Decl. ¶ 1.

39.     Later this same day, Howard went to Isernhagen and reported what was discussed during his conversation with Kirkpatrick.  Ex. D ¶ 13; Ex. G¶ 1.

40.     Specifically, Howard told Isernhagen that Kirkpatrick told him his job was being eliminated and told him when and why his job was being eliminated. Ex. D ¶ 13. Howard also told Isernhagen that after their meeting, he started telling his co-workers he was being let go. Ex. D ¶ 13. Finally, Howard told Isernhagen that after he told his co-workers this information, Kirkpatrick called him and told him to stop talking and sharing information. Ex. D ¶ 13.

41.     Given all the circumstances and Howard's reaction, Isernhagen believed Howard was telling her the truth about his interactions with Kirkpatrick. Ex. D ¶ 13.

42.     The next morning, on December 13th, Isernhagen spoke with Kirkpatrick about what Howard told her. Complaint ¶ 39; Ex. D ¶ 14. Isernhagen told her that they needed to go to HR right away to report what Kirkpatrick had disclosed. Complaint ¶ 39; Ex. D ¶ 14.

43.     When Isernhagen and Kirkpatrick went to HR, they informed Reed that Howard had made a complaint. Ex. B ¶ 11; Ex. D ¶ 14.

44.     Reed asserts in her declaration that, during the discussion, among other things, Kirkpatrick reported to her that Howard asked her if the layoff would be in PACs (his position) or transport and that Howard asked her specifically if the person being laid off was one of his coworkers – the only other PACS administrator at LUH. Ex. B ¶ 12. Kirkpatrick responded, "No. I would never get rid of her." Ex. B ¶ 12.

45.     Reed then advised Kirkpatrick, as she had done many times before, to stop communicating about anything related to the RIF and to stop interacting with Howard. Ex. B ¶ 12. She also told Kirkpatrick that Isernhagen would be communicating with Howard in her place. Ex. B ¶12.

46.     Neither the communications at the daily huddle, nor the additional information shared with Howard were approved to be communicated. Ex. B ¶¶ 11-12; Ex. D ¶ 13. According to Reed, it was inappropriate for Kirkpatrick to engage in the discussion with Howard and it was further inappropriate for her to comment on one of his coworkers. Ex. B ¶ 12. Additionally, the premature, unapproved communications caused much angst amongst the staff and were another reason for her termination. Ex. B ¶ 11; Ex. D ¶ 12.

47.     Due to Kirkpatrick's conduct, Reed directed Isernhagen to tell Kirkpatrick to go home for the rest of the day on February 13th. Ex. B ¶ 13; Ex. D ¶ 14.

48.     Later that same day, Reed asked Isernhagen to call Kirkpatrick again and tell her to stay home the next day (February 14th) so that legal could be informed of the situation involving Howard. Ex. B ¶ 13; Ex. D ¶ 14.

**Kirkpatrick's Miscommunications About The RIF Caused An Employee To Unnecessarily Believe She Was Losing Her Job.**

49.     On February 14, 2020, Reed and Isernhagen were advised that Cindy Sloan ("Sloan"), a Radiology Tech, was upset about changes to the Radiology Tech schedules. Ex. B ¶ 14; Ex. D ¶ 16. As a result, they both called Sloan. Ex. B ¶ 14; Ex. D ¶ 16.

50.     During the phone calls, Sloan informed Reed and Isernhagen that Kirkpatrick had been holding meetings with the staff on February 6, 2022, without Isernhagen present. Ex. B ¶ 15; Ex. D ¶ 16.

51.     According to Sloan, during the meetings, Kirkpatrick advised the staff they needed to cut 1.75 FTEs in Radiology Techs. Ex. F 125:18-21; Ex. B ¶ 15; Ex. D ¶ 16.

52.     Sloan also reported that Kirkpatrick said to her, in front of all the other staff that "because you are a 0.75, it affects you the most." Ex. B ¶ 15; Ex. D ¶ 16.

53.     Sloan further reported that Kirkpatrick asked her if she was willing to try working the "graveyard shift." Ex. F 44:4-6; Ex. B ¶ 15; Ex. D ¶ 16.

54.     Sloan reported she replied that she did not know if she could physically do it because she was 59-years-old. Ex. B ¶ 15.

55.     According to Sloan, Kirkpatrick responded that she needed to know by February 21st. Ex. B ¶ 15; Ex. D ¶ 16.

56.     Sloan then reported that when she got called into work on February 10th, she found a note on the schedule showing she was removed from her shifts on February 28th and 29th and that she was scheduled for a graveyard shift on February 16th. Ex. B ¶ 15; Ex. D ¶ 16.

57.     Sloan expressed to Reed her concerns that she was placed on graveyard shifts without further discussion and that she thought she may be losing her job since Kirkpatrick also had told her that those being laid off would be advised by February 28th and she saw that her shifts had been cancelled starting that date. Ex. B ¶ 15.

58.     Sloan expressed to Isernhagen that she was concerned that she was losing her job and that she felt Kirkpatrick had given her no choice but to move to the graveyard shift if she wanted to keep a job at LUH. Ex. D ¶ 16.

59.     Kirkpatrick's conduct related to Sloan is a further reason why she was terminated. *See* Ex. B ¶¶ 15, 17. It was inappropriate and unprofessional for her to single Sloan out, especially in front of Sloan's colleagues. Ex. B ¶15.

**LUH Terminated Kirkpatrick Because She Could Not Be Trusted With Sensitive Information and Failed To Timely Report Legal Issues.**

60.     On February 14th, Reed asked Isernhagen to call Kirkpatrick to let her know that legal was still working through the situation involving Howard and that she needed to take the next Monday, February 17th, off. Ex. B ¶16; Ex. D ¶15.

61.     On February 14th, Reed also brought the issues related to Kirkpatrick to the attention of Andrew Ritz ("Ritz"), Chief Operations Officer at LUH. Ex. B ¶ 17.

62.     Subsequently, Ritz, Christina Johnson ("Johnson") (the former CEO of LUH), and Reed met to discuss the concerns they each had about Kirkpatrick's misconduct. Ex. B ¶ 17. They

agreed that the severity of Kirkpatrick's misconduct, based on the reports received from Howard, Sloan, Isernhagen, and Kirkpatrick herself, warranted termination. Ex. B ¶ 17.

63.    On the morning of February 18, 2022, Reed asked Isernhagen to meet with Ritz and her privately. Ex. B ¶18; Ex. D ¶18. Because of Kirkpatrick's carelessness with sensitive communications and her persistent failures in timely reporting issues brought to her attention that could impact LUH legally, Ritz and Reed informed Isernhagen that the decision had been made to terminate Kirkpatrick. Ex. B ¶¶18-19.

64.    Because Isernhagen was Kirkpatrick's direct supervisor, Reed asked Isernhagen to call Kirkpatrick to inform her of the decision to terminate her employment. Ex. D ¶ 18. Ritz and Reed were also present on the phone so that Ritz and Reed could inform Kirkpatrick of the reasons for her termination. Ex. B ¶ 18; Ex. D ¶ 19.

65.    During the call, Ritz and Reed informed Kirkpatrick that she was being terminated for the misconduct described above. *See* Ex. B ¶¶ 18-19; Ex. D ¶ 19.

66.    Later that afternoon, LUH delivered via courier a Corrective Action Form to Kirkpatrick. Ex. B ¶ 18.[1] The Form explained the main reasons for her termination. Ex. B ¶ 18.

67.    Ritz and the other LUH decisionmakers, including Reed, had no reason to question the accuracy of the reports made by Sloan, Howard or Isernhagen, which they relied on and honestly believed in making the decision to terminate Kirkpatrick. Ex. B ¶ 20.

**<u>Kirkpatrick Has Confirmed That She Neither Engaged In Participation Nor Opposition, As Defined Under And Required By Title VII To Establish A Claim Of Retaliation.</u>**

---

[1] The Corrective Action Form is attached to Reed's Declaration as Ex. 1.

68.  Kirkpatrick's unemployment benefits hearing was held on June 3, 2020, and was
continued on June 26, 2020 (together, the "Hearing"). *See generally* Ex's. A and F.

69.  At the Hearing, Kirkpatrick testified about the "real reason" she believed she was
fired from LUH:

> Q: … at the end of your testimony the other day, you testified that you
> believe the real reason you were fired was because your name or your title
> was listed in the two EEOC charges filed by Lauren Carson and Veronica
> Smith; is that correct?
>
> A: Correct. That's correct.
>
> Q: And you were being honest when you said that?
>
> A: Yes.
>
> Q: And is that what you really believe?
>
> A: That is what I believe, yes.
>
> Q: So you believe that you were fired, not because of any action on your
> part, but because Lauren Carson and Veronica Smith used your name in
> their charges of discrimination; correct?
>
> A: Correct, correct.

Ex. F 98:24-99:13.

70.  Kirkpatrick also confirmed during the Hearing that she never believed there were
any wage disparities in the Imaging Department at LUH:

> Q: Did you agree with the assertions of Lauren Carson or Veronica Smith
> that, at the time you were supervising diagnostic imaging, or managing the
> imaging department, there were illegal wage disparities in your areas of
> control?
>
> A: No… I felt at that point, that they didn't really have a claim…
>
> …

> Q: … And you didn't ever believe that there was an improper disparity in wages between males and females in the imaging department under your control; is that correct?
>
> A: Correct. Because from what I could see, it didn't appear to be… correct.

Ex. F 101:14-102:4; 102:11-15.

71.      Finally, Kirkpatrick testified about whether she took any actions to address the alleged illegal wage disparities at LUH brought to her attention and whether she took any action to support such claims:

> Q: … you never told human resources or upper management Longmont United Hospital that there were illegal wage disparities within your areas of control that you were aware of; is that correct?
>
> A: Correct, because I was never aware of any… correct.
>
> …
>
> Q: … did you ever take any actions that were supportive of the claims of discrimination by Lauren Carson or Veronica Smith?
>
> A: No.

Ex. F 102:5-10; 102:16-19.

## I.      KIRKPATRICK DID NOT ENGAGE IN PROTECTED ACTIVITY.

To state a *prima facie* case for retaliation under Title VII, the plaintiff must show that "(1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action." *Timmerman v. U.S. Bank, N.A.,* 483 F.3d 1106, 1123-24 (10th Cir. 2007). There are two distinct categories of protected activities: (1) participation in a Title VII investigation or proceeding or (2) opposition to practices unlawful under Title VII. 42 U.S.C. § 2000e-3(a).

As described more fully below, Kirkpatrick neither engaged in participation nor opposition and therefore, her retaliation claim should be dismissed.

**A.    Kirkpatrick Testified She Was Fired Not Because Of Any Action On Her Part, But Because Former Employees Used Her Name In Their Charges Of Discrimination.**

Kirkpatrick's Complaint alleges that she engaged in protected activities, allegedly resulting in her termination, when she (1) "stated to Ms. Carson that she would be neutral to Ms. Carson's claims of sex-based pay disparity"; (2) "reported Ms. Carson's claims of a sex-based pay disparity to Human Resources"; and (3) "told the truth about two former employees' job performance to Ms. Reed." Complaint ¶¶ 51-53. Yet, when asked what she believed to be the reason for her termination, Kirkpatrick confirmed that it was nothing that **she** participated in or opposed and thus, the protected activity and causation elements of her retaliation claim are not met. *See* SOF ¶ 69.

To be clear, LUH's reasons for terminating Kirkpatrick's employment had nothing to do with her being mentioned in the charges. Nevertheless, Kirkpatrick's retaliation claim fails because she testified that she took no action, none whatsoever, and therefore she cannot establish a *prima facie* case. *See Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002)("an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII.")

Kirkpatrick has since abandoned her sworn testimony and now asserts in her Complaint that she was retaliated against for three entirely different reasons. Even if this Court were to disregard Kirkpatrick's own sworn admission of inaction, none of the three actions that Kirkpatrick now relies on as the basis of her retaliation claim constitute protected activity, as explained more fully below.

**B.    Kirkpatrick Did Not Believe There Was Any Wage Disparity Under Her Watch And Thus She Could Not Have Sincerely Been Opposing Equal Pay Violations.**

Kirkpatrick's retaliation claim also fails because "[t]o constitute protected activity, [the] [p]laintiff must have had a reasonable, good faith-belief that the conduct she reported violated Title VII." *McGowan v. Bd. Of Trustees for Metropolitan State University*, 114 F.Supp.3d 1129, 1139 (D. Colo. 2015); *see also Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 385 (10th Cir. 1984). Kirkpatrick has already admitted she maintained no such belief. *See* SOF ¶ 70. In fact, Kirkpatrick asserted in the Hearing that Carson and Smith "didn't really have a claim" and that she "didn't ever believe that there was an improper disparity in wages between males and females in the imaging department[.]" SOF ¶ 70.

Further, Kirkpatrick's Complaint does not assert that she believed that there were illegal or discriminatory wage disparities. As the supervisor, if she believed that there were unfair pay practices going on, Kirkpatrick would have been the one with responsibility to report them and help fix them. She did not do either of those things. Therefore, if she now asserts that she believed there were legal problems, it would simply demonstrate yet another instance of her failed leadership.

**C.    Kirkpatrick Never Communicated to LUH That She Was Concerned About Unlawful Discrimination. To The Contrary, She Admitted She Never Took Any Action On The Claims Of Discrimination Made By Former Employees.**

Finally, according to the Tenth Circuit, "[t]he purpose of § 2000e–3(a) is to let employees feel free to express condemnation of discrimination that violates Title VII. That purpose is hardly served by imposing sanctions upon employers who take action against employees who never communicate their concern about unlawful discrimination." *Petersen v. Utah Dep't of Corr.*, 301

F.3d 1182, 1189 (10th Cir. 2002). Consequently, "to qualify as protected opposition the employee **must convey** to the employer his or **her concern** that the employer has engaged in [an unlawful practice]." *Hinds v. Sprint/United Mgmt. Co.,* 523 F.3d 1187, 1202-03 (10th Cir. 2008) (emphasis added).

During the 6/24/2020 Hearing, the undersigned counsel asked Kirkpatrick whether she took any actions to address the alleged illegal wage disparities or whether she took any action to support the claims of discrimination made by former employees. SOF ¶ 71. Considering Kirkpatrick did not believe in Carson's and Smith's claims in the first place, as discussed above, it should not come as a surprise that Kirkpatrick answered both questions in the negative. *See* SOF ¶¶ 70-71. In fact, entirely absent from Kirkpatrick's Complaint is any "concern" she had for unlawful discrimination at LUH. Instead, Kirkpatrick has even gone so far as admitting she would be "neutral" about Carson's claims. Pl. Complaint ¶¶ 22, 51.

Accordingly, Kirkpatrick's admissions during the Hearing undermine and contradict the allegations she put forth in her Complaint at every turn. Kirkpatrick's attempt to go back to the drawing board to try to recharacterize the reasons she believed she was terminated – two years after she admitted otherwise – should not be taken seriously by this Court. Because Kirkpatrick did not engage in participation or opposition, as defined by Title VII, her retaliation claim should be dismissed.

## II. KIRKPATRICK'S LEADERSHIP FAILURES, INCLUDING NON-REPORTING AND INAPPROPRIATE COMMUNICATIONS, CONSTITUTED LEGITIMATE, NON-RETALIATORY REASONS FOR TERMINATION.

Even if this Court finds that Kirkpatrick can establish a *prima facie* case of retaliation, she cannot show that LUH's reasons for terminating her are pretextual for retaliation. Under the

burden-shifting analysis applied in employment discrimination and retaliation cases, once the employer articulates a legitimate, non-discriminatory reason for termination, the employee must carry the burden to show pretext. *See Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000). If the employer honestly believed the reasons it gave for termination, it does not matter whether the underlying facts are disputed. *See Bacy v. Chickasaw Nation Indus.*, 854 Fed. Appx. 944, 947 (10th Cir. 2021).

A.    **The Relevant Inquiry Is Whether LUH Believed Kirkpatrick's Leadership Failures Had Occurred And Terminated Her Because Of Them.**

The Tenth Circuit has outlined the relevant test for determining pretext:

"[T]he pertinent question in determining pretext is not whether the employer was right to think the employee engaged in misconduct, but whether that belief was genuine or pretextual." *Pastran*, 210 F.3d at 1206 quoting *Hardy v. S.F. Phosphates L.C.,* 185 F.3d 1076, 1080 (10th Cir. 1999).

Where there is no evidence to suggest that decision-makers did not honestly believe the reasons given for termination, there is no genuine issue of material fact. *E.g.*, *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1179 (10th Cir. 2006) ("a challenge of pretext requires us to look at the facts as they appear to the person making the decision to terminate plaintiff"), quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1230, 1231 (10th Cir. 2000). Courts "may not second guess the business judgment of the employer." *DePaula v. Easter Seals*, 859 F.3d 957, 970 (10th Cir. 2017).

**B.    The Declarations Of LUH Employees and Administrators Attached Hereto Demonstrate That LUH Was Justified In Believing Kirkpatrick's Leadership Failures Had Occurred.**

Submitted to this Court along with this MSJ are declarations signed by three of Kirkpatrick's former direct reports, as well as a declaration signed by Kirkpatrick's Director, Keri Isernhagen. Each of these persons reported incidents or communications which demonstrated Kirkpatrick's leadership failures. Not only did their declarations corroborate the other facts known to LUH decisionmakers at the time, but these employees have submitted sworn statements under penalty of perjury. LUH was certainly justified in believing those reports and did, indeed, rely on those reports, as declared by Reed. *See* SOF ¶ 67.

**C.    Because LUH Honestly Believed Its Reasons For Terminating Kirkpatrick, It Does Not Matter Whether The Underlying Facts Are Disputed.**

In *Bailey v. Am. Phoenix, Inc.* 735 Fed. Appx. 524, 528 (10th Cir. 2018), the Tenth Circuit recognized that a plaintiff "cannot create a triable issue of fact as to pretext" if the plaintiff merely believes the employer's reasons for termination are "inconsistent with [the plaintiff's own] opinion of [her] work practices." Thus, if Kirkpatrick cannot present any evidence showing LUH did not honestly believe she engaged in leadership failures, her case should be dismissed. *See also Bacy*, 854 Fed. Appx. at 947 (plaintiff's argument that summary judgment was "inappropriate because she raised a genuine issue of material fact as to whether she was actually insubordinate" failed because it did "not create a genuine issue of material fact or support [plaintiff's] burden of showing pretext" since the relevant inquiry is "whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs.").

Attached for the Court's review is a declaration signed by Reed. *See* Ex. B. In her declaration, Reed attests that she, Ritz, and Johnson determined that the severity of Kirkpatrick's

conduct warranted termination and that they had no reason to think that those reporting their concerns were being untruthful. SOF ¶¶ 62, 67. Kirkpatrick's failure to report was not without consequence. Both Carson and Smith filed lawsuits.[2] Consequently, Ritz, in consultation with Reed and Johnson, terminated Kirkpatrick's employment. Because Kirkpatrick has no evidence that those involved in the decision to terminate her employment did not honestly believe the reasons given for termination, her retaliation claim should be dismissed.

## CONCLUSION

For the reasons stated herein, LUH respectfully requests that Kirkpatrick's Complaint against LUH be dismissed with prejudice pursuant to Fed. R. Civ. P. 56.

Respectfully submitted this 1st day of February, 2023.

HALL, RENDER, KILLIAN, HEATH & LYMAN, P.C.

By:  *s/ Mark L. Sabey*
    Mark L. Sabey, #16319
    M. Brian Sabey, #50206
    Lindsay K. McManus, #56572
    999 17th Street, Suite 800, Denver, CO 80202
    303-801-3538 / marksabey@hallrender.com
    303-802-1293 / lmcmanus@hallrender.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATION OF COMPLIANCE

I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1).

---

[2] *See* Carson & Smith v. Centura Health, U.S.D.C. Colorado, Civil Action No. 21-cv-02262-NYW

**CERTIFICATE OF SERVICE**

The undersigned certifies that on this 1st day of February, 2023, a true and correct copy of the foregoing was served via CM/ECF which gives electronic notification to the following:

Kiron R. Kothari
Rachel E. Ellis
LIVELIHOOD LAW, LLC
3401 Quebec Street, Suite 6009
Denver, CO 80207
krk@livelihoodlaw.com
ree@livelihoodlaw.com
*Attorneys for Plaintiff*

　　　　　　　　　　　　 *s/ Rebecca Gibson*　　　　　　　　　　　
Rebecca Gibson, Legal Administrative Assistant