**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-CV-01567

**KARI KIRKPATRICK**,

Plaintiff,

v.

**CENTURA HEALTH-LONGMONT UNITED HOSPITAL, d/b/a LONGMONT UNITED HOSPITAL**,

Defendant.

---

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Kari Kirkpatrick, by and through her counsel, hereby responds to Defendant Centura Health-Longmont United Hospital d/b/a Longmont United Hospital's Motion for Summary Judgment:

### INTRODUCTION

Plaintiff began her employment with Centura Health ("Centura") in Pueblo, Colorado in May 2002. In September 2015, Plaintiff became the Lead Diagnostic Technician for Defendant. Plaintiff received multiple promotions and awards for her performance, and until her sudden termination, never received any discipline in 17 years.

In December 2019, Plaintiff reported concerns about equal pay violations to Director of Radiology, Keri Isernhagen, and Human Resources Director, Marie Reed.  When Defendant was faced with two EEOC charges from transport aides alleging equal pay violations in January of

2020 naming Defendant as a witness, Ms. Reed asked Plaintiff about performance problems of the EEOC claimants. When Plaintiff explained that there were no performance problems, Ms. Reed instructed her to look for evidence of poor performance of the claimants. Ms. Reed was disappointed by Plaintiff's position. Within a week of the last meeting about the equal pay allegations, Plaintiff's employment was suddenly terminated for implausible reasons.

**RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS ("RSUMF")**

1. Denied. Plaintiff was hired by Centura on May 29, 2002. *Ex2, 33:23-25*; *Ex3, LUH_KK_106-109, 120-138, 140-160*. Plaintiff moved to Centura's Longmont United Hospital ("LUH") as a Lead Diagnostic Tech in September 2015. *Plaintiff's Complaint, ¶12; See also Defendant's Answer, ¶12.* Plaintiff was promoted to the Manager of Imaging position at LUH at the end of February 2019. *Ex2, 34:3-7.*

2. Admitted.

3. Admitted in part. This Harassment Prevention Training addressed the need to immediately "notify HR . . . or your direct supervisor. . . any time you heard of any kind of harassment." Deny that this Harassment Prevention Training addressed the need to immediately "notify HR . . . or your direct supervisor" any time you heard of any kind of discrimination. *Ex2, 49:23-50:11 Ex3, LUH_KK_608-661.*

4. Admitted.

5. Denied. Though ExsB-D contain this inadmissible hearsay, Mark Mott did not advise Plaintiff about impending legal action. He merely said he "talked openly with [his] coworkers" about his conversation with Lauren Carson. *ExC.* Plaintiff did not speak with Mr. Mott about this situation at all until mid-January after Ms. Carson had already filed

her EEOC charge. *Ex4, 119:10-23*. Plaintiff first heard Ms. Carson was planning to file an EEOC charge from Ms. Carson herself at the company Christmas party on December 28. Plaintiff reported this conversation to Marie Hulett, Ms. Isernhagen, and Ms. Reed the following Monday, December 30. *Ex2, 44:8-45:12, 47:11-49:10, 76:4-10. Ex3, Kirkpatrick_14-20 at ¶¶46-48.*

6. Denied. *RSUMF #5; Ex2, 44:8-45:12, 47:11-49:10, 76:4-10; Ex3, Kirkpatrick_14-20 at ¶¶46-48; ExB at ¶5.*

7. Admitted.

8. Plaintiff can neither admit nor deny what Ms. Reed understood; regardless, Ms. Reed then failed to take prompt action and instead waited for an EEOC charge to be filed.

9. Denied. When Plaintiff reported Ms. Carson's potential EEOC charge to Ms. Reed, her only response was "if it comes through, it'll come through at my desk, so there's nothing we need to do until we see it." The company took no further action until it received Ms. Carson's EEOC charge. *Ex2, 44:8-45:12, 47:11-49:10, 76:4-10; Ex3, Kirkpatrick_14-20 at ¶¶46-48, 53.*

10. Denied. The investigation into the allegations began once the EEOC charges were received. Ms. Reed investigated by asking Plaintiff to produce examples of performance deficiencies for the EEOC claimants. *RSUMF #6, 8, and 9.* Ms. Carson resigned December 4. *Ex3, CarsonSmith_20.*

11. Denied. Plaintiff did not know about Ms. Carson's complaints until after Ms. Carson resigned to attend Nursing School. *Ex2, 44:8-45:12, 47:11-49:10, 76:4-10; Ex3, CarsonSmith_20, Kirkpatrick_14-20 at ¶¶46-48.*

12. Admitted in part. On December 30, 2019, Plaintiff reported Ms. Carson's complaints to Ms. Hulett, Ms. Isernhagen, and Ms. Reed. However, Plaintiff denies that she learned about this from Mr. Mott on December 9, 2019. *Ex2, 44:8-45:12, 47:11-49:10, 76:4-10, Ex3, Kirkpatrick_14-20 at ¶¶46-48.*

13. Admitted.

14. Denied. *RSUMF #6.*

15. Denied. Plaintiff was terminated for notifying Centura of a potential EEOC charge, being named in EEOC charges of discrimination, and participating in the investigation. *Ex2, 44:8-45:12, 47:11-49:10, 76:11-15; Ex3, Kirkpatrick_14-20 at ¶¶46-48, 52.*

16. Admitted.

17. Denied. During the meeting on February 19, 2019, Ms. Reed asked Plaintiff if Veronica Smith had requested any pregnancy-related accommodations and Plaintiff responded, "no, not at this time." *Ex2, 52:13-53:4, 54:15-18.* Plaintiff admits she met with Patient Transport Aide Morgen Frank, but the meeting was not about accommodations for Ms. Smith. Ms. Frank was upset because she felt that Ms. Smith was picking on her. Ms. Smith never requested any accommodations. *Ex2, 52:13-19, 53:1-3, 54:15-18, Ex4, 112:4-12, 123:8-18, 137:1-10.*

18. Admitted in part. Although the meeting between Ms. Frank and Plaintiff took place prior to Ms. Smith filing an EEOC charge, Plaintiff disagrees with the characterization of the conversation.

19. Admitted that ExB contains this inadmissible hearsay. *RSUMF #17.*

20. Admitted. To clarify, Plaintiff had no reason to believe Ms. Smith needed an accommodation as she had not requested one and her meeting with Ms. Frank was not about a potential accommodation for Ms. Smith. *Ex4, 137:1-10.*

21. Admit, although Plaintiff was given this instruction on her last day at work before her sudden termination. *SADF #41-43, 48-49.*

22. Denied. *RSUMF #15.*

23. Admitted in part. Although Plaintiff was involved with making recommendations regarding the upcoming reduction in force ("RIF"), others were also involved in this process. *Ex4, 106:2-12.*

24. Denied. *RSUMF #23.*

25. Denied. Though ExsB-D contains this inadmissible hearsay, Defendant's management instructed Plaintiff to notify the Diagnostic Department of the upcoming RIF. *Ex2, 39:6-9, 41:12-42:7, 59:11-60:8; Ex5, ¶8.*

26. Admitted.

27. Denied. Though, ExD contains this inadmissible hearsay, Dave Eddington (the individual interested in retiring early), Plaintiff, and Ms. Isernhagen met together to discuss a potential retirement related to the RIF. Following that meeting, Plaintiff and Mr. Eddington met with Ms. Reed. *Ex2, 40:13-41:1.*

28. Plaintiff lacks sufficient knowledge to admit or deny.

29. Admitted.

30. Admitted that ExB contains this inadmissible hearsay.

31. Denied. Plaintiff and Mr. Eddington met with Ms. Isernhagen to discuss his options prior to meeting with Ms. Reed. *Ex2, 40:13-41:1.*

32. Denied. Though ExB contains this inadmissible hearsay, Plaintiff told Mr. Eddington she believed that HR would process his RIF by the 20th. *Ex2, 66:5-11.*

33. Denied. *RSUMF #31.*

34. Denied. *RSUMF #32.*

35. Denied. *Id.*

36. Denied. Though ExD contains this inadmissible hearsay, this was never identified as a reason for Plaintiff's termination until Defendant's Motion for Summary Judgment.

37. Denied. On February 12, 2020 Xander Howard asked if the Radiology Support Department was going to be affected by the RIF. Plaintiff told him that all departments were being affected. *Ex2, 43:13-15, 67:16-68:7l; Ex4, 107:23-109:3.*

38. Admitted. Mr. Howard specifically asked Plaintiff if the RIF was going to affect all the departments in the hospital, whether it would affect PACs or transport, and about selection. Plaintiff told him that selections would be based on a number of factors including hire date, performance evaluations, corrective actions, and other duties at the hospital. *Ex2, 43:13-15; Ex4, 107:23-109:3.*

39. Denied. If Mr. Howard spoke with Ms. Isernhagen, Plaintiff denies that his communication with her accurately reflected the conversation he and Plaintiff had. *RSUMF #38.*

40. Denied. Though ExD contains this inadmissible hearsay, Plaintiff did not have any
    discussion with Mr.  Howard about his employment or whether it would continue. *Ex2,
    43:13-15.*

41. Plaintiff lacks sufficient knowledge to admit or deny how Ms. Isernhagen felt about her
    conversation with Mr. Howard.

42. Admitted in part. When Ms. Isernhagen told Plaintiff of her conversation with Mr.
    Howard, Plaintiff recounted the actual conversation for Ms. Isernhagen. *Ex2, 69:8-18.*

43. Admitted in part. During this meeting, Ms. Isernhagen told Ms. Reed what Mr. Howard
    told her, and Plaintiff asked Ms. Reed if she'd done something wrong. Ms. Reed
    responded, "No, it's okay. Sometimes people hear things that they think they want to
    hear." *Ex2, 69:12-18.*

44. Admitted in part. Ms. Reed asserts this in her declaration; however, Mr. Howard did not
    specifically ask about one of his coworkers, nor did Plaintiff specifically comment on that
    coworker. *Ex2, 67:16-68:7; Ex4, 107:23-109:7, RSUMF #38.*

45. Denied. Ms. Reed did not tell Plaintiff to stop communicating about the RIF. She simply
    told her that she would have to discuss Mr. Howard's status with legal. *Ex2, 69:17-25.*

46. Denied. The information Plaintiff shared with Mr. Howard was common knowledge and
    was not confidential. *Ex2, 68:4-7; Ex4, 136:9-13.*

47. Denied. Ms. Isernhagen asked Plaintiff to stay home on Friday, February 14. *Ex2, 70:12-
    13.*

48. Denied. On the evening of Friday, February 14, Ms. Isernhagen called Plaintiff and asked
    her to stay home on Monday. She told her that they were waiting to hear from Mr.

Howard and that they were concerned that if both of them were at the hospital at the same time, something could be construed as retaliation. *Ex2, 70:12-21.*

49. Admitted that ExsB and D contain this inadmissible hearsay.

50. Denied. Though ExsB and D contain this inadmissible hearsay, Ms. Isernhagen had instructed Plaintiff to meet with every member of the diagnostic department, let them know that there was going to be a RIF, and ask if anyone would be willing to take a voluntary RIF. *Ex4, 124:11-19.*

51. Admitted that ExsB and D contain this inadmissible hearsay.

52. Denied. Though ExsB and D contain this inadmissible hearsay, Plaintiff did not tell Cindy Slown that it would affect her the most. Upon information and belief, Ms. Slown is the individual referred to as Cindy Sloan in Defendant's Motion for Summary Judgment. *Ex4, 125:22-25.*

53. Denied. Though ExsB and D contain this inadmissible hearsay, the graveyard shift was also offered to others because they did not know who would be let go. *Ex4, 126:4-11.*

54. Denied. Though ExB contains this inadmissible hearsay, Ms. Slown told Plaintiff that she was interested in the graveyard shift but was unsure how long she would be able to work that shift. *Ex4, 126:14-25.*

55. Denied. Though ExsB and D contain this inadmissible hearsay, Plaintiff advised Ms. Slown she could try the graveyard shift and let Defendant know by February 21st if she thought she could perform that shift and wanted to take it.

8

56. Denied. Though ExsB and D contain this inadmissible hearsay, Plaintiff doesn't know whether Ms. Slown was removed from her regular shift on February 28 and 29 or what date Ms. Slown moved into the graveyard shift. *Ex4, 127:1-6.*

57. Admitted that ExB contains this inadmissible hearsay.

58. Denied. Though ExD contains this inadmissible hearsay, Plaintiff did not tell Ms. Slown she must work the graveyard shift if she wanted to continue working at LUH. *Ex4, 126:6-25.*

59. Denied. *RSUMF #52-53.*

60. Admitted.

61. Plaintiff lacks sufficient knowledge to admit or deny.

62. Plaintiff lacks sufficient knowledge to admit or deny.

63. Plaintiff lacks sufficient knowledge to admit or deny.

64. Admitted in part. Plaintiff admits that she received a termination call from Ms. Reed, Andrew Ritz, and Ms. Isernhagen. However, Mr. Ritz was the person who told her she was terminated. *Ex2, 71:9-72:7.*

65. Admitted that Mr. Ritz and Ms. Reed were on the termination call but denied as to the reasons for her termination. *RSUMF #15.*

66. Admitted that Plaintiff received a Corrective Action Form but denied as to the reasons for termination. *Id.*

67. Denied. Prior to Plaintiff's termination, she had never received any discipline or reprimand. Plaintiff was always told that she was doing an exceptional job and received numerous awards during her time at Centura. Ms. Reed told her that her attention to

detail was impressive. Mr. Ritz had previously told her that he was encouraged that she would be able to take the department and improve the morale and enthusiasm. Centura's CFO was happy to have her assistance with the centralized scheduling problems. *Ex2, 61:10-25, 63:21-64:17.* Mr. Howard's credibility should have been questioned, as he had been engaging in "glaring and egregious" timecard fraud. *ExD, ¶11.*

68. Admitted.

69. Admitted in part but denied as a mischaracterization of Plaintiff's testimony. *Ex2, 36:13-76:15, Generally.*

70. Denied. Plaintiff's testimony is clear that she did not feel there were illegal wage disparities *at that point. Ex4, 101:14-102:15*

71. Denied. Plaintiff's participation regarding Ms. Carson and Ms. Smith's claims was neutral and truthful. *Ex4, 101:14-102:15.*

## STATEMENT OF ADDITIONAL DISPUTED FACTS ("SADF")

**Plaintiff Had a Record of Excellent Performance and Leadership.**

1. Plaintiff started working for Centura in May 2002. *Ex2, 33:24-25; Ex3, LUH_KK_0106-109, 120-124, 130-134, 140-144, 152-154.*

2. Throughout her employment, Plaintiff received excellent performance evaluations. *Ex3, LUH_KK_0106-109, 120-124, 130-134, 140-144, 152-154; Ex4, 136:21-25.*

3. In September 2015, Plaintiff transferred to LUH as a Lead Diagnostic Tech. *Ex3, LUH_KK_243-245, 254.*

4. After one year at LUH, Plaintiff was promoted to Supervisor of Diagnostic Imaging. Ex3, LUH_KK_161-163, 171.

5. On February 5, 2019, Plaintiff accepted a promotion to Imaging Manager of the LUH Radiology Diagnostic Department. *Ex3, LUK_KK_91-92.*

6. Prior to Plaintiff's discharge, Defendant never issued her any disciplinary action(s). *Ex2, 64:15-21; Ex4, 136:21-25.*

7. Management (including Ms. Reed and Ms. Isernhagen) told Plaintiff she was doing an "exceptional job" and commended for her ability to lead as a manager. *Ex2, 61:8-25.*

8. Plaintiff's coworkers commended Plaintiff's leadership and performance. *Ex3, Kirkpatrick_33-35; Ex4, 136:21-25.*

9. Defendant issued Plaintiff numerous awards for her performance and leadership. *Ex3, Kirkpatrick_31-32, 36; Ex4, 132:14-134:5.*

10. On November 6, 2019, Defendant issued Plaintiff a prestigious award for her performance and leadership. *Ex3, Kirkpatrick_36.*

## Plaintiff Engaged in Multiple Protected Activities Between December 2019 and February 2020.

11. Plaintiff organized a Christmas party for LUH on December 28, 2019. *Ex2, 44:11-13.*

12. During that Christmas party, Ms. Carson (former Patient Transport Aide) notified Plaintiff and Ms. Hulett that she planned to file a complaint of wage-based sex discrimination with the Equal Employment Opportunity Commission ("EEOC"). *RSUMF #5-6; Ex2, 44:24-45:12.*

13. Ms. Carson asked Plaintiff whether she would be friend, foe, or remain neutral. *Ex2, 44:24-45:12.*

14. Plaintiff stated that she must remain neutral. *Ex2, 44:24-45:12.*

15. This is the first time Plaintiff became aware of any complaint of discrimination by Ms. Carson. *Ex2, 44:11-15.*

16. Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), prohibits sex discrimination in employment. *42 U.S.C. §2000e-2(a)(I).*

17. In 2020, Defendant had no policies requiring a supervisor to report a complaint of discrimination within any certain time period.

18. The next Monday, December 30, 2019, Plaintiff reported this pending Title VII complaint to Ms. Isernhagen and Ms. Reed. *Ex2, 47:8-49:10; ExB, ¶4; ExD, ¶7.*

19. Ms. Reed responded that any charge would come to her, so there was nothing to do until then. *Ex2, 49:7-10.*

20. On January 16, 2020, Ms. Carson filed a complaint of sex-based wage discrimination under Title VII with the EEOC and CCRD. *Ex3, Kirkpatrick_444.*

21. Defendant did not begin to investigate Ms. Carson's concerns of discrimination until it received notification of the complaint being filed, on January 16, 2020. *ExB, ¶5; Ex4, 134:18-23.*

22. After Defendant received Ms. Carson's complaint, Ms. Reed met with Plaintiff to ask her about any performance issues Ms. Carson had. *Ex3, Kirkpatrick_14-20 at ¶¶53-55.* Ms. Reed did not ask Plaintiff about her knowledge of any wage disparities. *Id.* Plaintiff truthfully answered that Ms. Carson did not have any performance issues. *Id.*

23. On January 31, 2020, Ms. Smith filed a sex-based wage discrimination complaint under Title VII and with the EEOC & CCRD. *Ex3, Kirkpatrick_445.* Ms. Smith specifically identified Plaintiff as a witness in this complaint. *Ex3, Kirkpatrick_445, IV(5).*

24. After Defendant received Ms. Smith's complaint, Ms. Reed met with Plaintiff to ask her about any performance deficiencies Ms. Smith may have had. *Ex2, 51:8-24, 52:15-53:4, 54:15-18; Ex3, Kirkpatrick_14-20 at ¶¶56-58*. Ms. Reed did not ask Plaintiff about her knowledge of any wage disparities. *Id*. Plaintiff truthfully answered that Ms. Smith did not have any performance issues. *Id*.

**There Was No Request For Medical Accommodations For Ms. Smith.**

25. Defendant' policy states, "[t]he first step for any associate in need of a reasonable accommodation is to request an accommodation from the Human Resources department, his/her direct manager, or Occupational Health. If the request is made to the associate's direct manager, that manager will contact the Human Resources Department for assistance." *Ex3, LUH_KK_676-679.*

26. The Americans with Disabilities Act prohibits an employer from inquiring into an employee's medical condition (e.g. inquiring into whether they need medical accommodations) unless such inquiry is job-related and consistent with business necessity. *42 U.S.C.A. §12112(d)(4)(A).*

27. Ms. Smith never asked Plaintiff about an accommodation. *Ex2. 51:8-24, 52:15-53:4, 54:15-18; Ex4, 137:1-10.*

28. Around November 2019, Ms. Frank notified Plaintiff that she felt taken advantage of because Ms. Smith was asking for help with stretcher transports. *Ex4, 114:14-117:10.*

29. At Centura, stretcher transports were always handled by two transport aides. Any time a transporter needed to do a stretcher transport, they initiated a second transporter. *Id.*

30. During this conversation, Ms. Frank never inquired about potential accommodations for Ms. Smith. *Ex.4, 114:14-117:10; ExE, Generally.*

**Plaintiff Did Not Disclose Confidential Information Pertaining to a RIF**

31. In late 2019 and early 2020, Defendant planned to implement a RIF. *Ex2, 59:8-60:3.*

32. Plaintiff had been involved in at least one RIF in the past. *Ex4, 143:1-144:12*. Defendant did not accuse Plaintiff of any wrongdoing in relation to this previous RIF. *Id.*

33. There were rumors flying around regarding this newer RIF and who would be laid off. *Ex5, ¶8.* Many staff were worried they would lose their jobs. *Id.*

34. Ms. Isernhagen instructed Plaintiff to discuss this RIF with the diagnostic department, because she believed that if the staff were aware of the plan and had a say in how it was implemented, they would accept it better. *Ex2, 59:8-60:3.*

35. On February 13, 2020, Plaintiff had one of many discussions with her team regarding the layoffs. *Ex5, ¶9.* During this meeting, Plaintiff did not name any specific individual who would be laid off. *Id.*

36. After the meeting, Mr. Howard cornered Plaintiff with questions about the layoff. He asked her if the RIF was going to affect all the departments, whether it would affect PACs or transport, and how the individual eliminated was to be selected. Plaintiff replied it would be based on a number of factors including hire date, performance evaluations, corrective actions, and other duties at the hospital. *Ex2, 67:16-68:7l; Ex3, Kirkpartick_427; Ex4, 107:23-109:3.*

37. Plaintiff did not tell Mr. Howard he was being selected for the layoff. *Ex2, 48:14-15, 68:21-69:25; Ex4, 107:23-109:7.*

38. The next day, Ms. Isernhagen told Plaintiff that Mr. Howard had come to speak with her yesterday and told her that at the daily huddle Plaintiff had informed everyone that Mr. Howard would be the employee let go. Mr. Howard threatened Ms. Isernhagen that it would be retaliation if he was let go. *Ex2, 70:1-21.* Later, Mr. Howard changed his allegation to stating that Plaintiff told him this in her office after the huddle, not during. See *Exhibit G*.

39. Ms. Isernhagen and Plaintiff told Ms. Reed about Mr. Howard's comments. Plaintiff asked if she had done anything wrong. Ms. Reed said no and that sometimes people just hear what they want to hear. *Ex2, 68:21-69:25.*

40. Ms. Reed said she needed to contact legal as they could be looking at a termination instead of a RIF for Mr. Howard. *Ex2, 68:21-71:8.*

41. That night, Ms. Isernhagen told Plaintiff to take a personal day the next day, Friday, February 14, so she would not run into Mr. Howard while they were sorting out the situation. *Ex2, 68:21-71:8.*

42. The next night, Ms. Isernhagen called Plaintiff and told her to take Monday, February 17 off as well. *Ex2, 68:21-71:8.*

43. On Tuesday, February 18, Plaintiff took a sick day. *Ex2, 68:21-71:8.*

44. As a supervisor, Plaintiff was expected to recommend employees to lay off as part of the RIF. *ExD ¶9.*

45. After hearing of another employee who took an "early retirement" package, Mr. Eddington (former X-Ray Technician) approached Plaintiff to ask about taking an early retirement as part of this RIF. *Ex5, ¶11.*

46. Plaintiff discussed Mr. Eddington's request with Ms. Isernhagen and Ms. Reed. ExB ¶9;
ExD ¶10.

47. Mr. Eddington took an early retirement as part of his voluntary RIF at the end of
February. *Ex5*, *¶12.*

**Plaintiff's Termination**

48. On February 18, 2020, a coworker told Plaintiff that Ms. Isernhagen announced to the
department that Plaintiff had been fired. *Ex2, 71:17-72:1.*

49. Plaintiff then received a call from Ms. Isernhagen, Ms. Reed, and Mr. Ritz. Mr. Ritz told
Plaintiff she was being fired for failure to meet productivity and confidentiality standards
and because she had failed to inform Centura of an employee's potential EEO claims.
*Ex2 36:20-37:21, 72:2-7; Ex3, Kirkpatrick_14-20 at ¶¶ 63-64.*

50. Ms. Reed admitted Plaintiff was terminated due to her report of Ms. Carson's pending
Complaint. *ExB, ¶5.*

51. In the termination notice, the reasons for Plaintiff's discharge were failing to report Ms.
Carson's legal concerns, failing to inquire about medical accommodations, failing to
review/update a "People Plan", and sharing confidential information relating to a layoff.
*Ex3, Kirkpatrick_37-38.*

52. On February 1, 2023, Defendant alleged for the first time Plaintiff was also discharged
for "essentially promising" an employee an early retirement. *SUMF#36.*

53. Defendant did not investigate any of the circumstances it alleges to have led to Plaintiff's
discharge. *Ex4, 134:18-23; Ex6* (citing Defendant's Motion for Summary Judgment and
*ExF* for evidence of an investigation).

**Unemployment**

54. In March 2020, Plaintiff applied for unemployment benefits. *Ex3, LUH_KK_0281-0283.*

55. Defendant disputed Plaintiff's eligibility for benefits, arguing discharge justification for violation of Company policy and careless or shoddy work. *Ex3, LUH_KK_0284-0286.*

56. On March 26, 2020, the Colorado Department of Labor and Employment determined that Plaintiff was unemployed through no fault of her own. *Ex3, Kirkpatrick_186.*

57. In June 2020, Plaintiff and Defendant participated in an unemployment hearing to where Defendant argued many of the same reasons for discharge in that hearing as in their current Motion for Summary Judgment. *Ex2; Ex4.*

58. On July 2, 2020, the Colorado Department of Labor and Employment issued an order awarding benefits and finding that Plaintiff was more credible and persuasive. *Ex3, Kirkpatrick_308-312.*

59. Defendant then appealed to the Industrial Claims Appeals Office ("ICAO"). On August 14, 2020, the ICAO affirmed the hearing officer's decision. *Ex3, LUH_KK_346-350.*

**LEGAL STANDARD**

Summary judgment is permitted where a party can establish that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. Proc. 56(a)*. There is "no genuine dispute" in a case where no reasonable jury could return a verdict for the nonmoving party. *Grayden v. Spring Creek Energy Partners, LLC*, 2022 WL 17972139 *4 (10th Cir. 2022), quoting *Bimbo Bakeries USA Inc. v. Sycamore*, 29 F.4th 630, 638 (10th Cir. 2022); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material"

where it may affect the outcome of the case. *Ulissey v. Shvartsman*, 61 F.3d 805, 809 (10th Cir. 1995); *Pigeon v. City of Oklahoma City*, 2022 WL 17660539, *3 (10th Cir. 2022).

A plaintiff survives summary judgment where they raise a genuine issue of disputed fact for each element of the prima facie case. *Kennedy v. Life Care Centers of Amer.*, 2023 WL 155874, *1 (D.Colo. 2023); *Hermann v. Salt Lake City Corp.*, 21 F.4th 666, 678 (10th Cir. 2021).

In reviewing a motion for summary judgments, all reasonable inferences and facts should be viewed in the light most favorable to the non-moving party. *Montgomery v. Cruz*, 2023 1437878, *3 (D.Colo. 2023); *Taylor v. Riojas*, 141 S.Ct. 52, 56 (2020).

## ARGUMENT

Once a Plaintiff has established a prima facie claim of discrimination, it is the Defendant's burden to articulate a clear and specific legitimate, non-discriminatory reason for the adverse action that the Plaintiff suffered. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973); *Dale Diamond v. W.R. Berkley Corp.*, 2023 WL 1956221 *4 (10th Cir. 2023); *Barcikowski v. Sun Microsystems, Inc.*, 420 F.Supp.2d 1163, 1174 (D.Colo. 2006); *Considine v. Newspaper Agency Corp.*, 43 F.3d 1349, 1363 (10th Cir. 1994).

The Plaintiff must then show that the employer's proffered reason(s) are not worthy of belief (i.e. pretext). *McDonnell Douglas Corp.*, 411 U.S. at 802-803; *Dale Diamond*, 2023 WL 1956221 at *4. When a plaintiff bringing a retaliation claim against an employer casts substantial doubt on many of the employer's multiple reasons for the adverse action(s), a jury could reasonably find that employer lacks credibility, and need not believe employer's remaining reasons. *Tyler v. RE/MAX Mtn. States, Inc*., 232 F.3d 808, 814 (10th Cir. 2000)

Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits an employer from retaliating against an employee for engaging in a protected activity. *42 U.S.C. §2000e-3(a)*. To establish a prima facie claim of retaliation under Title VII, the claimant must establish that (1) they engaged in a "protected activity", (2) they suffered an employment action, and (3) there is a causal connection between the protected activity and the adverse employment action. *Westby v. BKD CPAs & Advisors, LLP*, 2019 WL 3292180, *6 (D.Colo. 2019); *Petersen v. Utah Dept. of Corrections*, 301 F.3d 1182, 1188 (10th Cir. 2002).

## I.    Plaintiff Engaged in Multiple "Protected Activities."

Under Title VII's "Participation Clause", a "protected activity" is broadly defined as any participation in an investigation, proceeding, or hearing under Title VII. *42 U.S.C. §2000e-3*(a); *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1152 (10th Cir. 2008). A person does not need to have a "reasonable good-faith belief" that any conduct violates Title VII to have engaged in a "protected activity" under Title VII's Participation Clause - indeed, courts have held that examples of "protected activity" under the Participation Clause include an attorney who defended an employer during an EEOC mediation (*Kelley v. City of Albuquerque*, 542 F.3d 802 (10th Cir. 2008)) and an employee who involuntary participated as a witnesses in an EEO investigation (*Merritt v. Dillard Paper Co.*, 120 F.3d 1181 (11th Cir. 1997).[1]

Plaintiff engaged in protected activities when she:

- Reported Ms. Carson's pending Title VII complaint to Defendant's management and human resources department. *SADF #11-18*;

---

[1] Notably, Defendant attempts throughout its Motion to confuse the reader by interposing rules pertaining to Title VII's Opposition Clause as though they applied to Title VII's Participation Clause, when it conclusively does not. See e.g. *Defendant's Motion for Summary Judgment*, Generally.

- Participated in Defendant's investigation into Ms. Carson's Title VII complaint. *SADF #20-22*;

- Was specifically named in Ms. Smith's Title VII Complaint. *SADF #23*; and

- Participated in Defendant's investigation into Ms. Smith's Title VII complaint. *SADF #23-24*.

## II.    Plaintiff Suffered an Adverse Employment Action.

An "adverse action" is broadly defined under Title VII's retaliation provision as an action which "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006); *Thompson v. N. Amer. Stainless, LP*, 131 S.Ct. 863, 867-868 (2011). Plaintiff suffered an adverse employment action when she was discharged by Defendant in February 2020. *SADF #48-51*.

## III.    There is a Causal Connection Between Plaintiff's Protected Activities and Plaintiff's Discharge.

For the purposes of Title VII retaliation, a "causal connection" exists where the adverse action would not have occurred "but for" the protected activity. *James v. James*, 129 F.Supp.3d 1212, 1230 (D.Colo. 2015); *Lincoln v. BNSF Railway Co.*, 900 F.3d 1166, 1209 (10th Cir. 2018).

One factor establishing such a causal connection is Defendant's admission that Plaintiff was discharged in part due to her report of Ms. Carson's pending EEOC complaint. *SADF #50 -51*. Had Plaintiff not engaged in the protected activity of reporting a pending Complaint of discrimination, she could not have been fired for that reason.

Another factor establishing such a causal connection is the temporal proximity between Plaintiff's protected activities and her discharge. *Mestas v. Town of Evansville, Wyoming*, 786 Fed.Appx. 153, 157 (10th Cir. 2019); *Foster v. Mtn. Coal Co., LLC*, 830 F.3d 1178, 1190 (10th

Cir. 2016). Here, Plaintiff was discharged only weeks after engaging in the aforementioned

protected activities. Compare *SADF #11-24* with *#48-51*.

Plaintiff can also establish a causal connection through the difference in Defendant's

treatment before and after her protected activities. Prior to engaging in any protected activity,

Defendant routinely recognized Plaintiff's performance and leadership through excellent

performance evaluations, promotions, commendations, and awards. *SADF #1-10*. However, after

Plaintiff engaged in protected activities, Defendant immediately began to assert "leadership

failures" and "poor performance", followed by sudden termination. *SADF #48-51*. Notably, this

disparate treatment mirrors Defendant's attempt to discredit Ms. Carson and Ms. Smith after they

filed their complaints of discrimination. *SADF #22, 24*.

## IV.    Defendant's Reasons for Discharge Are Pretextual.

### A.  *Defendant's Argument Regarding an "Honest Belief" That Plaintiff Failed to Meet Performance Expectations Is Inappropriate for Summary Judgment.*

Defendant's argument that it "honestly believed" the asserted reasons for Plaintiff's

termination requires that it show that (1) the belief was reasonable and (2) the action of

discharging Plaintiff based on that belief was taken in good faith. *Patel v. Univ. of Kansas Hosp.*

*Auth*, 345 F. App'x 343, 345 (10th Cir. 2009). However, any determination as to one's state of

mind, reasonableness of a belief, and/or whether one acted in good faith necessarily requires an

application of fact and drawing of inferences, and so is inappropriate for summary judgment.

*Koopman v. Water Dist. No. 1 of Johnson Cty., Kans.*, 972 F.2d 1160, 1163-1164 (10th Cir.

1992); *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1241 (Colo. 1998); *Vu v. Fouts*,

924 P.d 1129, 1132 (Colo.App. 1996); *E.E.O.C. v. Western Trading Co., Inc.*, 2012 WL

1460025, *7 (D.Colo. 2012).

Despite seventeen years of excellent performance and leadership at Centura Health, Defendant failed to investigate the allegations against Plaintiff that it asserts led to her discharge. *SADF #53*.

Furthermore, Defendant's reasons for Plaintiff's discharge are inconsistent. Defendant has abandoned some reasons it claimed for Plaintiff's discharge (the "People Plan"), has changed its story about Plaintiff's alleged failure to report a legal concern, is now alleging that Plaintiff merely failed to report such a concern in a timely manner, and is has alleged a new reason for Plaintiff's discharge (e.g. promising an employee an early retirement). *SADF #51-59; RSUMF #52.*

### B. Plaintiff's Refusal Ask If an Employee Needed a Medical Accommodation Is Not a "Legitimate Non-Discriminatory Reason" To Discharge Her.

Defendant's first reason for Plaintiff's discharge is that Plaintiff failed to ask a pregnant employee if she needed medical accommodations to perform her job. *SADF #51*.  However, an employer is prohibited from inquiring into an employee's medical condition (e.g. whether they need medical accommodations) unless such inquiry is job-related and consistent with business necessity). *SADF # 26.* Additionally, Defendant's accommodation policy explicitly states that the process must be started by a request from the associate who needs the accommodation. *SADF #25-30*. Also, Plaintiff was asked to discuss an accommodation with Ms. Smith on the last day she worked for Defendant – she had no time to follow up. *SADF #25-30.*

### C. *Plaintiff Did Not Violate Confidentiality in Discussing a Potential Reduction in Force With Her Team.*

Defendant alleges Plaintiff was discharged because she inappropriately disclosed confidential information regarding an upcoming RIF. *SADF#50-51*. But Plaintiff did not disclose any confidential information regarding this RIF. *SADF #33-37*.[2]

Multiple people were discussing the RIF, including spreading rumors about who would be laid off. *SADF #33*. Despite this, Plaintiff was the only person Defendant disciplined for allegedly engaging in such discussion. Pretext may be established through showing that Plaintiff was treated differently than nonprotected employees engaging in the same or similar behavior. *Kendrick v. Penske Transp. Serv., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000). Plaintiff was previously involved in RIFs and exercised appropriate discretion regarding confidentiality. *SADF#32-51*.

Additionally, Plaintiff was following instructions when she identified Mr. Eddington as a potential candidate for voluntary RIF. *SADF #34*, *44*. She had discussed this possibility with both Ms. Isernhagen and Ms. Reed. *SADF #46*. Ultimately (and in contradiction to Defendant's assertions that it does not offer such packages), Mr. Eddington retired with a voluntary RIF package. *SADF #47*.

## CONCLUSION

Ultimately, genuine issues of material fact exist as to whether Plaintiff engaged in protected activities, whether a causal connection exists between those activities and Plaintiff's discharge, and whether Defendant honestly believed it's assertions for Plaintiff's discharge.

---

[2] It is inappropriate in summary judgment to determine who is "telling the truth" when there is a conflict in testimony. *Anderson*, 477 U.S. at 255.

Because Plaintiff has met her burden of proving a prima facie case for retaliation exists, and

because genuine disputes of material fact exist, Plaintiff respectfully requests a denial of the

Defendant's Motion for Summary Judgment.

Respectfully submitted this 22nd day of February, 2023.

*/s/ Kiron R. Kothari*
Kiron R. Kothari
Rachel E. Ellis
Livelihood Law, LLC
3401 Quebec Street, Suite 6009
Denver, Colorado 80207
Phone: (720) 673-4926
Email: krk@livelihoodlaw.com
       ree@livelihoodlaw.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on February 22, 2023, the foregoing Plaintiff's Response to Defendant's
Motion for Summary Judgment was filed with the Clerk of Court using the CM/ECF system
which will send notification of such filing to the following e-mail addresses:

Melvin B. Sabey
melsabey@hallrender.com

Mark L. Sabey
marksabey@hallrender.com

M. Brian Sabey
briansabey@hallrender.com

Lindsay K. McManus
lmcmanus@hallrender.com

/s/ *Amber Klein*